City of Brunswick v. Honeywell International, Inc. and the Georgia Power Company. I know we have multiple lawyers who are arguing. Ms. Theodore, you will begin, so whenever you get set up, you can proceed to the podium. Good morning, Elizabeth Theodore on behalf of Honeywell, and I'm going to address Federal Officer Removal and Grable. CERCLA is a unique federal scheme with a goal of ensuring a single, coordinated EPA-led cleanup of Superfund sites. Once a Superfund site is designated, it becomes a massive federal project that EPA oversees for decades. EPA works with states and others to develop a comprehensive cleanup plan. So, counsel, let me jump in because you don't have a ton of time, and the Federal Officer Removal one, I think, is the meat of a lot of what we have to decide today. So, I'm very sympathetic to your argument. If the claim underlying the dispute here, if the original complaint was that there needed to be remediation efforts of your property or damages resulting because of your property, I think if that were the case, you'd have a very strong argument on Federal Officer Removal given the uniqueness of CERCLA. But, and here's the but, it seems to me that the complaint is not about the Superfund site, but that the complaint is about city-owned property, and that the underlying complaint is that pains, I can read portions to you, but I'll save you the time, is that pains to say that it's the nuisance to its property, that it's the trespass of its property for which it is seeking damages. And because of that, we're not talking at all about the Superfund site. We're talking about pollution that made its way from the Superfund site years ago, and continuing, but years ago, and sits now in city property that they're saying is a trespass and a nuisance for which I am required to damages. So the first is that I would say that it's not, that's an incorrect characterization, and I would say that the Court, as you know, is supposed to credit our theory of these claims for purposes of the connection or association prong of I'm not sure we're not entitled to read the complaint. I mean, we may need to read it in a light most favorable to you, but we can only read it as it is. You can't just make up a theory and say that's the reason. Let me point you to a couple of allegations. So paragraph 75, they say that our activities at the plant continue to cause the mercury and PCBs to be discharged into the Turtle River, surrounding marshlands, and onto property of the City of Brunswick. And that's an allegation that the ongoing pollution at the plant site is flowing into the Turtle River and flowing onto the property. I know, but they're only seeking damages. The part that you sort of mumbled at the end was on its property. I mean, that's the key. You're right. They have alleged that, although I actually don't think that that is the nature of the trespass and the nuisance. But assuming it is, I don't see how that's not damages to its property that you're still throwing, metaphorically, throwing stuff onto my property for which is a nuisance to me and for which it's trespassing. It may be damages to their property, but their claim is that we can abate it and that we have to abate it by taking action at our property. I don't know that they ask for abation. They seem to just ask for damages for what you're causing. They're saying, hey, listen, the stuff that you're throwing on my property that you threw in 1959 and 1970 and are still throwing on my property is there, and so I need damages for you because you've now invaded my property entrance. Well, but it's an element of their claim. Abatability is an element of their claim for continuing nuisance. So I'm not sure. I know you say that, and that gets to whether it's, I think, the argument that your co-counsel is going to make. But I'm not sure abatability is a part of the nuisance claim. I think it goes to their statute of limitations issue, so I'll grant you that. But I think I read Georgia nuisance law for damages to not necessarily require abatement. I think that's incorrect. So the Stroud case, I think there's a bunch of cases in the Georgia Power brief that say that you have to have the legal right to abate to bring a continuing trespasser to nuisance them. And, Your Honor, they allow that. Yeah, but that's where the party is seeking injunctive relief or some sort of forward relief. And we have, in the Parker case, we've essentially said that there isn't a required or showing of abatement, and that's in a damages case, right? I don't think that's true. Are you talking about the footnote in the Parker case? That's right. Yeah, the footnote in the Parker case specifically says that they didn't have to show abatability on the land of the defendant because the claim was that they should be abating on the land of the defendant. That's what that footnote said, and that's like this case. They're claiming that they should be abating on our property and that that would prevent  Let me ask you this. If I don't read their complaint that way, does that defeat officer removal for you? No. And that's for a second reason. Okay. They are completely incorrect that we are allowed to do something on their property right now. The CERCLA Superfund site covers their property, too. So Section 122E6 bans any response actions not approved by EPA at the facility, which is defined in Section 96019B, to mean any site or area where a hazardous substance has come to be located. The 1995 administrative order, which is a docket Can you show me the consent decree where it covers their property? Yes. So Section 4 of the consent decree defines So Section, you're talking about, okay, I'm in Article 4, which is definitions. Okay. So they define effective property essentially to mean any real property where EPA determines that remedial efforts are needed. It says, shall mean any real property at Operable Unit 1 of the site. So that's not this county's property. And any other real property where the EPA determines at any time that access, land, water, or other resources use restrictions and or ICs are needed to implement the remedial action for Operable Unit 1. In other words, the property around it, I have to be able to access it. That's what they're talking about there. Including but not limited to the area known as the LCP Chemicals Marsh, which occupies approximately 760 acres and is bordered by the former Glynn County Land Disposal Facility. That's not what we're talking about here for city land. And a pistol firing range to the north. That's not what we're talking about. The Turtle River and associated marshes to the west and Brunswick cellulose plant to the south. Well, the cellulose plant is not, and the river bed is not, or the river is not, but I believe they do claim the bed and some other properties, riparian rights associated with that. Can I point you to another provision? Yes. Which is Section 8, titled Property Requirements. Okay. It has a paragraph 17A, which talks about access requirements for assessing the need for planning or implementing. What page of the consent decree? This is the consent decree, so it's pages 9 and 10 of the consent decree.  Thank you. Great. So, on page 10, it says that what the EPA needs to do is assess the need for planning or implementing additional response actions at or near the site. Right. So, the whole point of this response action is to protect the Turtle River and the surrounding areas. And it is 100% the case that we are not allowed to take action that is inconsistent with the EPA's remedy on their property. That's covered. And to your point about paragraph 75 of their complaint, that talks about the activities continuing to cause toxic mercury and PCBs to be spilled, your position, I think, as I understand it, is that that's a direct challenge to the cleanup efforts pursuant to the Superfund site, because they're saying that you're not abating properly and it's continuing to leak. Yeah. And if I could just make one more point, which is that, so literally the only thing Honeywell has been doing at this site for the past 30 years is engaging in this EPA-ordered abatement and remedial process. And so the claim for tortuous conduct, ongoing tortuous conduct, if we are engaged in ongoing tortuous conduct, it has to be the abatement. And if the Court has any doubts about this, the Court can look to the Second Amendment complaint to clarify. And the Second Amendment complaint explicitly makes clear that we are correct. So you're not suggesting that when we have a Superfund site that defines the limits of the site, the surrounding property owners who are not included in the Superfund site are never going to be able to sue. You're saying that because of the terms of the consent decree in this case, it prohibits the city's claim. Or are you arguing more broadly? There are a variety of kinds of cases where people are allowed to sue. So personal injury based on the past pollution, for example, wouldn't necessarily be preempted. But the problem here for the city is that they didn't sue 30 years ago based on our alleged tortuous activity. Yeah, but what Judge Bryant said has to be right. In other words, the only way it seems to me that they can't do what they're doing is if they are covered by this either as a matter of the terms of the complaint or the consent decree. But if they're not for either of those things, then how is it that an affected property owner five miles down the line who has pollution being thrown onto their property doesn't have a right to sue? So they are covered, and for that reason they're prevented from taking any restoration action by 122E6. But also this complaint is clearly alleging that our tortious conduct is the failure to abate at our property, which has the consequence of allowing continued pollution to flow into the Charter River and into their property. And again, if the Court has any doubts about that question, the second amended complaint I'm not sure we can look at it. And for reasons we'll get into, but I'm not sure we can look at that. Oh, fair, fair. And I happen to agree with you, by the way. But I'm not sure we get to look at it. Thank you. And you have reserved two minutes. Thank you. Mr. Brewton. Please, the Court. Ben Brewton on behalf of Appellant Georgia Power Company. I believe that Judge Luck has entered directly into the issue before the Court as it concerns Georgia Power Company. The issue is that this case should not have been remanded back to the Court because diversity jurisdiction does exist. Georgia Power was fraudulently joined to this because the plaintiff's original complaint contains three paragraphs which very clearly define a permanent nuisance, which has a four-year statute of limitations. So if we look at that original complaint, it's a permanent nuisance. The statute ran in this case in 1976. A little bit of the facts are operative in this case. Why is the district court not right that this area of the law is a bit of a morass at the Georgia level through no fault of anybody's? And as a result, I can't clearly and convincingly say that you're right about whether the allegations here are either permanent or continuing such that it triggers the statute of limitations. I'll certainly concede that this area of the law is a bit of a morass. I would respectfully suggest to the Court in this case the morass is not quite as murky as it may be, and here's why. For a permanent nuisance judge, the question becomes, is the source of the nuisance doing exactly what it was designed to do? Is it clearly operating as it was intended to operate, and would it go off into infinity if allowed to continue? The fact here is what was designed by the power company was an electric generating plant that burned coal. A byproduct of that was mercury, and that went up to 1972. I know, but that's not an inherent part of power. In other words, it seems to me that, and we have made great strides with regard to eliminating pollution, and if something is not, in other words, if there's a factory and the factory is humming, you can't do anything about the humming. The factory exists, it's a fixed structure, and it's humming. So that's a permanent injury or a permanent nuisance to there that is known about and for which triggers the responsibility to bring a lawsuit. But pollution doesn't seem to be a permanent state of being. In other words, it can be filtered out, as I understand it. There are certain kinds of coal which are cleaner burning than other kinds of coal, and certainly remediation efforts can be made ongoing as these things are happening. So I just have trouble understanding how that is necessarily a permanent condition. It is a permanent condition because Georgia has particular rules that apply to public utilities, and the rules there is that, of course, the lawsuit has to be brought from the first time the action commences. You have one action to bring for all your damages at one time, and it has to be at the time it commences and whence it was observed. What if they didn't, I mean, the coal plant was operating, it's been operating for decades. It's not anymore, I recognize. But this has been a longstanding sort of history of Georgia that we've had this coal plant. But we didn't always know that coal plants, while we certainly can see a coal plant, you know it's operated as a coal plant, it took some time for the science to catch up for everybody to realize that coal plants are depositing mercury on property. So if we take you at your argument, at what point do people become aware that we have not just a coal plant, but a coal plant that is polluting with mercury? Well, I can tell you exactly when we became aware of it in this case. This lawsuit was filed in October of 2022, and so the question was in the preceding four years, which would have been the time to bring this case, were the City of Brunswick or was it aware that as a byproduct of burning coal, you got mercury? And the record and briefs we have submitted to the court are replete with examples back in 2017 where the City of Brunswick said. What they show is, what those examples show is, they knew that the property was burning mercury. I don't think there's a doubt about that. But that seems to me a little different than the question we have, which is, imagine, forget the city, imagine I'm just a regular property owner and I live downriver about three miles. And I discover 20 years later when I go to do a project in my backyard that there is a thin layer of mercury that exists somewhere on the ground level of my home. I don't know that three miles away is going to cause the mercury from the plant, which I did know was being polluted, to be on my property. And what I understand is the City of Brunswick has filed an affidavit which states exactly that, which is, while I may have known about the mercury, I had no idea this mercury was on my property. Why can't the court credit that or at least say that, based on that evidence that you presented and they presented, there's not a clear and convincing case? I think, Judge, first of all, the affidavits submitted don't purport to speak for the city. They don't speak to institutional knowledge. They speak to individuals. Yeah, but these are people who work for the city. Sure. But I believe there were people that worked for the city prior who have the adequate knowledge and the knowledge was in the community. And I would suggest to you the knowledge was so widespread that it was known to the gentleman or woman who lived three miles down the river. This is not something new, and it was known in the four years that preceded the filing of this lawsuit. And so even if it is an abatable nuisance, it wasn't filed in time. And lastly, as my time winds down, I would suggest to the court this issue of this being an abatable nuisance. If it is, let's assume it's a continuing nuisance. Then as an essential element of that claim under Georgia law, under the Mercer University-Gypsum case, we are entitled to come onto the property for the purpose of abatement if placed on notice. In the district court, Judge Hall tried to distinguish that, but frankly, I believe his distinction where he said, well, this problem is over on y'all's property. And so as such, you don't have the right to—the abatement is not an issue. But the reality is the property being allegedly damaged is not our property. As such, under clear Georgia law, even for a continuing or abatable nuisance, we would have the right to enter onto their property to remediate, which we were not given. As such, no claim under Georgia law because there's no claim. We're improperly in the suit. And as such, there is total diversity jurisdiction and— Is the city obligated to offer the defendants the ability to enter the property to abate? Under my understanding of Georgia law, in the Mercer University case, the Gypsum case, yes. So you're not required to ask for permission like, okay, you've told us there's pollution on your property. We're coming on. You don't have to show that as the defendants. I think that what the law requires is that in their—particularly in their complaint, they either have to show that you have the legal right to do it or they have to allege that they gave you the opportunity to do it. None of which the original complaint in this case files and one additional comment. The original complaint in this case, which we're operating on, also makes no reference to migration or pollution onto this property in the four years preceding the complaint. All it says is that at some point in the distant past, there was coal burned, mercury emitted, it got onto the city's property. There is no allegation concerning the four years prior to the complaint. I've gone over my time, but subject to any commentary or questions, I'll be glad to answer those. And you'll still have a minute for rebuttals. Thank you. Mr. Bell. May it please the Court, my pleasure to be before you all. Counsel, it's a pleasure to have you here. It seems to me, though, that the—and I'm talking about the original complaint, not the Second Amendment complaint. Okay. So my question to you is only about the original complaint. Yes, sir. It seems to me that you're trying to walk a very fine line. And on the one hand is the line that you don't want to raise any allegations about the Superfund site, because you know if you do, you're going to be in the trouble that you're in right now. And on the other hand—wait, I'm not done with your tightrope yet. On the other hand, you need to get around the statute of limitations by showing a continuing problem. And I wonder if those two things are not running headlong into each other in the way that your opposing counsel very eloquently told us when she was up here. I will agree with the eloquent part, but not with the part that those two things are irreconcilable. Tell me how. This has been a very difficult case because the legal allegations or factual allegations have never involved a full quotation of the paragraphs of the complaint that they're doing. Well, thankfully I've read it in full. So tell me—so let's focus on paragraph 75, which is the one that Judge Branch asked about and the one your opposing counsel quoted on. And I can tell you my own personal view that that is the toughest one for you. So tell me about allegation 75. Okay. All right. You're correct. We put in language dealing with abatability in terms of statute of limitations. I believe you said continuing and abatable, right? Doesn't that come directly from the statute of limitations case law? No, not from any Georgia Supreme Court decision. I know, but it— And not from this 11th Circuit decision. I know, but you— But some district court and some court of appeals cases which are not authoritative. I know, but wasn't that the point of doing that, which was to make sure that you fell within that? And that's good lawyering. Don't— Absolutely. I'm not being critical. You're correct. But there is one missing part here. It's almost the elephant in the room. And that's not in the words of the complaint, but there are no words to the contrary. Georgia Power contends that they are evading this trespass and nuisance right now, today, through following the plan. We don't challenge it. They are ordered to do things to reduce the pollution and are doing that. I know, but if the injury, if the trespass and nuisance is not from that which is there, but that which is continuing to come from the Superfund site, then aren't you, in a way, through your tort actions, challenging the efficacy of the abatement effort on the Superfund site? I think abatability, and we cited a thing in the 2nd Circuit case, there are not many of them doing it, but abatement doesn't mean tomorrow is gone, but obtaining steps to make it better. Now, in fact, I think a lot of what they brag about— I know, but if the EPA says, do it this way and you're good, and we, as a matter of law and fact, will protect you, and then you, as a state tort plaintiff, come in and say, the very thing that you're doing is causing harm to our property, then aren't you, in a way, attacking the thing that the EPA ordered? No. Tell me how wrong. How wrong is that? It may be, but the whole thing on this is it takes years for mercury put into the water here. In fact, the Turner River isn't really a river. It's just an end in the marshes. If you take a boat up it, you go about two or three miles and it no longer exists. It's just a tidal creek, a big tidal creek, being called a river since before the Revolutionary War. But water comes back and forth, back and forth. So it's not—it would take a long time, because this property is not abutting the Turner River. The big land is over on the other side of the Bruntook Peninsula. It would take years to move there and, in fact, continues to move on and off. The contamination on that land today is not necessarily the same molecules of methylized mercury and PCBs that were on it five years ago. But back to Judge Luck's question. In paragraph 75 of the complaint, you say that defendant Honeywell's activities of the plant site continue to cause toxic mercury and PCBs to be spilled. How is that not the continuing polluting of the city property running smack into the consent decree for the Superfund site? Because even if the whole Superfund site were walled off, which it's not, you'd have mercury moving back and forth. But that's what the whole consent decree is about. The EPA says, okay, we've got to clean up the site. We know it is going to take a significant period of time, typically. But if you do this, everything is good, defendant Honeywell. And you're saying, no, it's not, because it's affecting our property. How is that not running into the consent decree? There's no such words in that consent decree. If you do this, you're a good incendious. No, in that consent decree, it does not ball out expressly. You're right, but it's CERCLA that's doing that work. So there's two pieces to this puzzle. CERCLA has a vision that was cited by them, I don't believe, that says district courts, federal courts, don't even have jurisdiction of an action to modify the plan. And you know why? Because every time EPA orders something, they file a new lawsuit. I know, but counsel, I guess the premise of Judge Branch's question, and I have the same question too, which is the litigation. The time to argue about the procedure for removing this stuff was in the court proceeding where they filed it. In other words, the consent decree is the end of a federal court action. You all could have intervened and objected and worked with EPA on the plan and objected and said it's ineffective because it affects our property. That's the time to litigate all this stuff. But once it's written in stone, does CERCLA allow us to then, does CERCLA not create an issue where those folks who are implementing the plan who are continuing to pollute your property are now federal officers that are subject to federal court jurisdiction? That's really the question before us. Okay. Well, first of all, I do not think they are. I think that Philip Morris, watching Philip Morris' case, makes it clear. In the other cases, the West Virginia University and the others, they aren't. They're more like parties being put on probation in order to do it. Except Philip Morris is a very different case. It is dealing with tobacco regulations and heavily regulated parties following governmental regulations. We're not going to say there's a federal officer situation here. This is CERCLA. It's different from RCRA. CERCLA is a unique statutory scheme, and it's where these defendants have an argument that they are operating as officers of EPA and cleaning up this site. That's very distinct from Philip Morris. Your Honor, they are not carrying out duties of EPA. They're carrying out obligations imposed upon them by order of the United States District Court. But the way CERCLA is written is this. EPA is primarily responsible for the cleanup. But where it chooses not to do it, it can order another party to clean up on its behalf. And that's where the consent decree comes from. It's the on its behalf part that they have been ordered to do it. And not only that, but EPA gets to tell you how, gets to tell you when, gets to approve the timeline. EPA has a lot of control here. And so this seems to take it outside of some of the other cases you've relied on for other statutes. And Watson says carrying out the duties or tasks where they have delegated federal authority. They aren't doing that. The federal authority is telling an adverse party what they have to do because they violated all sorts of federal laws. But where Congress puts the primary responsibility on the EPA for the cleanup. Well, I think it's their responsibility to clean it up because the wrongdoer hasn't done it. And they can take control just like a policeman can take control. To make somebody do what they should have done. They should have cleaned it up. Actually, they should have never made this mess. It has never been legal to pollute other people's property with toxic chemicals. But we're traveling under CERCLA, and CERCLA, as we've discussed, is a unique statutory scheme. It's a comprehensive scheme. And that's what you're running head-on into in this case, and we're trying to sort out. And I feel comfortable in the federal authority that we cited in the brief that if we were, that we have a right to have, if we were telling EPA to do it differently, it would be a totally different case. Even if we were seeking injunctive relief, it might be different. But when we're talking about pollution of property. But isn't holding them responsible monetarily for the way they are doing it a challenge to the way that they are doing it? No. Really? They may be doing it. If you're acting, if I'm acting in a tortious way and you seek damages, are you not attacking the way that I am acting? We are suing them for what's on our property. Right. I don't disagree with that. But with the allegations about whether or not it's abatable and their contention, we have to go on your property to do anything to reduce it. In fact, that is factually not true. Because they are bragging that they're doing just that right now. Under the plan as it is, it may be the absolute best plan that could be. We aren't challenging that. We're challenging the harm to private property. I know, but it's the continuing harm that is happening while they are in the middle of the abatement, right? In other words, if the lawsuit was this, let's assume the abatement started in 2020. And your argument was from 1969 until 2019, they injected pollution in the air and in the water and that pollution ended up in my property. And that is a nuisance and a trespass. I can understand that lawsuit. But if the lawsuit is everything you've done since then is continuing to put in the air and put into the ground all of this pollution, then aren't you attacking the way that they are cleaning up their property? No. We said that the things we're doing is a sign of abatement. I mean, that's totally different. In fact, they contend there's less now than there was then. Not that it's gotten worse because of the continual releases. They contend it's far less. And I'm not sure whether that's just dilution of pollution because it's spreading. It spreads. That pollution spreads from Jacksonville, Florida up near Savannah. They found PCBs of the time only used by Honeywell in the dolphins tested in Jacksonville. It's all over the place. They found it in birds, Woodstock. They're actually making the marsh. The paper was published before any of this EPA action about the Woodstock and the harm to the mink and other birds there. Birds are shaken with tremors from the mercury poisoning. It's misapplication. And I think the Watson case and the cases that have followed it make it clear that ordering a wrongdoer to take steps to mitigate his wrongdoing is not carrying out the duties of EPA. EPA has a lot of power. But they're on one side, just as my learned, very learned, very bright, very skilled counsel are on one side of this case and I'm on another. They aren't on EPA's team working for EPA to help EPA do EPA's work. They have a lot of lawyers that have argued for decades over what they're going to be made to do by EPA. Can I ask you a question? Is there a reason why you don't want to be in federal court? You know, I'd like to try it in a superior court. I've actually tried, I've probably spent more of my litigation time over my 50-something year career at the bar in federal courts than in state courts. I tried, had a pile of cases for Judge Delamo of the Southern District Jury, one of the finest judges you would ever know, anytime. But we're happy with that. Thank you. But if it stayed in federal court, you know, we would proceed. Lisa Godbey Wood, who's the resident judge, is brilliant and a fine judge and she rules quickly. But she formerly represented these folks. They represented them against me and my firm. But we would not get her. And I'm not sure who we would get. We're happy with the judge. But the case ain't going to go away. But I think we're right. And I think that counsel, we're on the, right now, and I think our waiver argument is meritorious. And the Booten's argument, it is. And Mr. Bell, you've gone over. What? You've gone over. I'm over my time. Yes. I stand by my briefs. Thank you very much. Thank you, counsel. And I love an active bench. Ms. Theodore, you've got two minutes. Thank you, Your Honor. I want to make sort of two main points. First, with respect to whether they are actually challenging implementation at the plant site. It's a low bar for allegations of a connection and association. I think this court's decision in Kaver said that if the defendant's allegations are true, it would establish that. Is this more of a connection case or a causation case than an officer case? I know this was sort of litigated on the first prong. But it really sounds like we've been talking a lot about the connection prong. I wonder if the district court should take a look at that in the first instance rather than us deciding that. I think the district court essentially made what we think are incorrect findings that go to the second prong. But the district court talked about them under the first prong. So our allegation in the notice of removal is that this implicates what we're doing at the source site. That's clearly plausible. And that's all the court needs to do to find that prong two is satisfied. And I'll also point the court to page four of the Henderson declaration that they filed in the district court below in connection with this complaint. In which she says that contamination has and is still migrating away from the source sites in and around and onto city of Brunswick, Georgia property. So that, again, confirms that our reading of the complaint that it challenges what's happening at the source site is plausible. But I also want to talk about sort of the other argument. If paragraph 75 wasn't there, if the continuing and abatement allegations weren't there, and it was just sort of what I described, which is stuff was spewed on my property. It's now there and I want to trespass. Would you have a harder time, do you think? We wouldn't be able to make the argument I just made. But we would be able to make the argument I'm about to make. Which is that the site that's covered by the Circle of Consent decree includes all areas where pollution has come to be located. And let me point you to a few other documents that make that clear. So first, the Federal Register provision at 61 Federal Register 3510, which we cited on notice of removal. That's the initial declaration of what the site is. That says very clearly that... I know, but that all folds into the consent decree, doesn't it? I mean, the consent decree is really what dictates what this is about, is it not? No, Your Honor. So the consent decree is just about Operable Unit 1. There's a lot of other stuff that's going on. The 122e6 provision that bars inconsistent response actions is triggered by the feasibility study that happened in 1995. So the consent decree is just sort of one part of what EPA is doing. So it's not the only thing that triggers the 122e6 bar. And I'll note that they allege at paragraph 70 and 71 of their complaint that EPA has been engaged in testing and monitoring in the Turtle River. So they're alleging that EPA is engaged in all sorts of stuff outside of the plant site. So I think for both of those reasons, this is removable under a federal officer. Thank you. Thank you. Mr. Bruton, you've got one minute. I will be brief by necessity and I would just reemphasize to the court regarding the Georgia Power Company. If there's not a viable claim against them, there is diversity of citizenship, and this case should be in the federal court. There's two questions. Is this a permanent nuisance when we last burned coal in 1972? Permanent nuisance defined under Georgia law created by an essential method of operation of the plant. There is nothing more essential to a coal-fired electrical plant than burning coal. So if it's a permanent nuisance, then the statute ran in 1976. If it is an abatable nuisance, we have the problem of not being allowed under the property to abate it and no right to enter. And additionally, the complaint, the original complaint by which this court must gauge the removal of this action has three paragraphs concerning the Georgia Power Company. And in none of those three paragraphs does it say that the coal you burned stopping in 1972 has within the last four years prior to the filing of our complaint got onto a property. It is silent as to that, and as such, this joinder is fraudulent. The case should be in federal court. Thank you. Thank you all. We have your case under advisement. Thank you.